# EXHIBIT 1

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | |
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| SUMMONS | ALIAS - SUMMONS | (2/28/11) CCG N001 |



**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY _____ DIVISION**

No. _____ **12 C H 0 0 7 4 1**

JENNIFER & DENNIS NEAGLE
_____
(Name all parties)
v.
WILLIAM S. LEAVITT and LEAVITT FINANCIAL
CONSULTANTS, INC. d/b/a LEAVITT CAPITAL
MANAGEMENT, INC.

Serve:
Leavitt Financial Consultants, Inc.
d/b/a Leavitt Capital Management, Inc.
c/o Alan Barry Patzik
Registered Agent
150 S. Wacker Dr., Suite 1500
Chicago, IL 60606

(X) **SUMMONS** ◯ **ALIAS SUMMONS**

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

⊙ Richard J. Daley Center, 50 W. Washington, Room 602 _____, Chicago, Illinois 60602

◯ **District 2 - Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

◯ **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

◯ **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

◯ **District 5 - Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

◯ **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60428

◯ **Child Support**
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 91731

Name: Novack and Macey LLP

Atty. for: Plaintiffs

Address: 100 N. Riverside Plaza

City/State/Zip: Chicago, IL 60606

Telephone: (312) 419-6900

WITNESS, _____

_____
Clerk of Court

Date of service _____, _____
(To be inserted by officer on copy left with defendant or other person)

JAN 0 9 2012

Service by Facsimile Transmission will be accepted at: _____
(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| SUMMONS | ALIAS - SUMMONS |



*00542101*

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

12CH00741

No. _____

JENNIFER & DENNIS NEAGLE
_____
(Name all parties)
v.
WILLIAM S. LEAVITT and LEAVITT FINANCIAL
CONSULTANTS, INC. d/b/a LEAVITT CAPITAL
MANAGEMENT, INC.

Serve:
William S. Leavitt
466 Sheridan Road
Glencoe, IL 60022

## (X) SUMMONS  ( ) ALIAS SUMMONS

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

(•) Richard J. Daley Center, 50 W. Washington, Room **602**_____, Chicago, Illinois 60602

( ) **District 2 - Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

( ) **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

( ) **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

( ) **District 5 - Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

( ) **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60428

( ) **Child Support**
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 91731_____
Name: Novack and Macey LLP
Atty. for: Plaintiffs
Address: 100 N. Riverside Plaza
City/State/Zip: Chicago, IL 60606
Telephone: (312) 419-6900

WITNESS, _____ JAN 0 9 2012

DOROTHY BROWN
_____
Clerk of Court

Date of service: _____, _____
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____
(Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

2012 JAN -9 PM 4: 24

CLERK
DOROTHY BROWN

| | | |
|---|---|---|
| JENNIFER & DENNIS NEAGLE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| WILLIAM S. LEAVITT and LEAVITT | ) | 12CH00741 |
| FINANCIAL CONSULTANTS, INC. d/b/a | ) | |
| LEAVITT CAPITAL MANAGEMENT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR ACCOUNTING AND OTHER RELIEF

Plaintiffs Jennifer Neagle ("Jennifer") and Dennis Neagle ("Dennis") (collectively, the "Neagles"), by and through their attorneys, Novack and Macey LLP, as and for their Complaint against Defendants William S. Leavitt ("Leavitt") and Leavitt Financial Consultants, Inc. d/b/a Leavitt Capital Management, Inc. ("LCM") (collectively, the "Defendants") state as follows:

## NATURE OF ACTION

1.     This Complaint arises from Leavitt's and LCM's wrongful conduct as the Neagles' financial adviser.

2.     Leavitt insinuated himself into the Neagles' lives, and convinced them to trust him and the company he controlled (LCM) with their financial well-being. He promised the Neagles that he and LCM would look after their finances and investments by, among other things, investing the Neagles in conservative and liquid investments designed to assure the Neagles' financial future and security.

3.     Leavitt, however, knew that the Neagles were utterly unsophisticated when it came to financial management and investments, and that they had come to him and LCM for help and guidance with respect to such matters. However, after gaining the Neagles' complete

trust and confidence, and taking control of their finances and investments, Leavitt and LCM preyed upon the Neagles' naiveté and betrayed their trust by: (a) recommending and placing the Neagles in risky, illiquid investments; (b) concealing and/or failing to disclose the true characteristics and risks of those investments; and (c) secretly lining their pockets with exorbitant fees and other undisclosed compensation flowing to Defendants from those investments.

4.     This Complaint seeks relief against Leavitt and LCM for their wrongdoing. It seeks relief for their breach of fiduciary duty, negligent misrepresentation and unjust enrichment. It also seeks an equitable accounting. Alternatively, it seeks relief against LCM for aiding and abetting Leavitt's wrongdoing.

## PARTIES AND VENUE

5.     Jennifer resides in Littleton, Colorado.

6.     Dennis resides in Morrison, Colorado.

7.     Leavitt resides in Glencoe, Illinois. Leavitt is a Certified Financial Planner, a financial adviser and an attorney.

8.     LCM is a financial advisory firm located in Northbrook, Illinois. It is controlled by Leavitt, and owned by Leavitt and his family members. LCM holds itself out as a company that prides itself on understanding its clients' financial needs, "goals and risk tolerances." LCM represents that it will grow its clients' "nest eggs" "prudently [and] conservatively," and that it will develop investment strategies customized to its clients' risk tolerances, objectives, financial needs, "life circumstances and preferences."

2

9.     Venue is proper in this Court under 735 ILCS 5/2-101 because: (a) Leavitt and LCM reside in Cook County, Illinois; and (b) the transactions, or some part thereof, out of which this cause of action arose occurred in Cook County, Illinois.

## GENERAL ALLEGATIONS

### The Neagles

10.     Dennis is a retired star baseball player. He had a brilliant and lucrative professional pitching career that was cut short by injuries.

11.     Dennis started playing in the major leagues at age 21, pitching for the Minnesota Twins. At 24, Dennis was traded to the Pittsburgh Pirates and achieved great success. By his late 20s, Dennis became a pitching star for the Atlanta Braves and later for the Colorado Rockies.

12.     Jennifer is a 39 year-old homemaker.

13.     Jennifer met Dennis in 1993, and they married in 1996. When they married, Jennifer was 23 years old and Dennis was 27. Dennis and Jennifer are divorced and have a 12 year-old son and 8 year-old twins. Jennifer never pursued a career. Instead, she took care of their children and supported Dennis's baseball career.

14.     As Dennis's pitching career skyrocketed in the late 1990s, the Neagles began to accumulate significant wealth at a very young age. Dennis and Jennifer -- both then in their 20s -- had no financial or investment experience and did not know how to manage their newly acquired income responsibly. The Neagles knew, however, that professional baseball careers often were short-lived and that the money Dennis earned playing baseball during his youth needed to last for the Neagles' lifetimes.

15.     Thus, Dennis and Jennifer reached out to Dennis's then-baseball agent, Barry Meister ("Meister"), for financial help. Meister recommended that the Neagles retain Leavitt and LCM to manage and invest their money.

16.     The Neagles took Meister up on his suggestion and set up a meeting with Leavitt.

**Leavitt Promises To Take Care Of The Neagles**

17.     In 1995, the Neagles had their first meeting with Leavitt. At this time, the Neagles were in their 20s and Leavitt was approximately 45 years old.

18.     During this meeting (and at numerous meetings thereafter) the Neagles told Leavitt that:

- They had no financial investment experience;

- They did not have the time to learn about or monitor their finances because of Dennis's rigorous baseball schedule, and they needed someone they could trust to do it for them;

- They wanted their money in conservative and liquid investments so it could be accessed as necessary to take care of their growing family; and

- They needed Dennis' baseball earnings to last throughout their lifetime.

19.     At Defendants' request, Dennis and Jennifer subsequently completed a written questionnaire, telling Leavitt and LCM that they needed to be placed in conservative investments.

20.     After being told about the Neagles' needs for conservative, liquid investments, Leavitt claimed that he and LCM had the expertise to ensure that the Neagles' financial future would be protected. He also told the Neagles that he and LCM would manage the Neagles' finances in a manner that was in their best interests and make appropriate investments on their behalf.

4

21.    Leavitt repeatedly promised that he and LCM would pursue investment strategies in line with the Neagles' need for conservative and liquid investments. Leavitt regularly also told Jennifer and Dennis that they could rely on him and LCM to handle their money and ensure their financial security for the rest of their lives.

**The Neagles Place Their Trust And Confidence In Leavitt And LCM**

22.    Leavitt was an engaging and persuasive pitchman. He dazzled the Neagles and won them over completely. Accordingly, the Neagles, put all of their trust and confidence in Leavitt and the company he controlled -- LCM. The Neagles relied on them to take care of their money, which Leavitt and LCM agreed to do.

23.    Ample examples exist of the degree to which the Neagles entrusted Leavitt and LCM with the Neagles' financial wellbeing. For example, beginning in 1995, the Neagles deposited all of Dennis's paychecks into an account at a Chicago-based bank selected by Defendants. Leavitt and LCM had full access to that account -- and any other accounts the Neagles held -- and had check-writing privileges and the ability to execute wire transfers on the Neagles' behalf. The Neagles identified LCM as their official billing address, and Leavitt and LCM paid all of the Neagles' bills and utilities. Leavitt and LCM also began to make numerous investments on the Neagles' behalf.

24.    As the years progressed, an even stronger bond developed between the Neagles and Leavitt. For example, the Leavitts and Neagles took vacations together. Leavitt visited with the Neagles on a regular basis and attended many of Dennis' baseball games. The Neagles trusted Leavitt so much that they named Leavitt in their wills as the executor of their estates and the trustee of certain accounts created for the benefit of one or more of the Neagles' children.

25.    Leavitt became like a father to the Neagles.  He was the Neagles' confidant and their sounding board for all major decisions.

26.    The same is true with respect to the trust and confidence the Neagles placed in LCM.  After all, the Neagles knew that LCM was controlled by Leavitt, which is why the Neagles trusted LCM just like they trusted Leavitt.

27.    In short, the Neagles completely and unequivocally trusted Leavitt and LCM to take care of them.

### Leavitt And LCM Place The Neagles In Improper "Alternative Investments"

28.    Based on their communications with Leavitt, the Neagles thought that Leavitt and LCM were investing them in conservative, liquid investments such as stocks, bonds, mutual funds, and cash -- just as Defendants had promised.

29.    Unbeknownst to them, however, Leavitt and LCM routinely recommended and placed the Neagles in investments that Defendants knew were totally at odds with the Neagles' investment needs.  Specifically, Leavitt and LCM recommended and invested the Neagles in hedge funds, private equity funds and other unregulated investments.

30.    These investments -- known in the industry as alternative investments (collectively, the "Alternative Investments") -- were neither conservative, nor liquid.  Instead, they were incredibly risky, not in the Neagles' best interests, and completely out of line with the Neagles' stated investment strategy of conservative, liquid investments.

### Hedge Fund Characteristics

31.    Hedge funds are funds that use one or more investment strategies, including hedging against market down-turns, investing in atypical asset classes such as currencies or distressed securities, and use speculative return-enhancing tools, such as leverage, derivatives,

6

and arbitrage. They are exactly the opposite of conservative investments, and they pose great risks to investors like the Neagles. Hedge funds are suitable only for investors who, unlike the Neagles, can withstand the risk of losing all of the money invested in the fund.

32.     Additionally, hedge funds, including many in which Defendants invested the Neagles' money, have negative income-tax consequences. For example, a hedge fund investor is usually a member of an LLC and taxed at the ordinary income rate based on the profits of the fund allocated to the investor, irrespective of whether or not those profits are distributed in cash. Thus, hedge fund investors often pay "phantom income" taxes because they are obligated to pay taxes on the allocated profits, even though they do not receive the cash needed to pay those taxes.

33.     Further, hedge funds usually are managed by a manager, who is paid very substantial management, transaction and performance fees. Performance fees are typically 20% of profits (net of management fees) above a designated benchmark, which means hedge fund managers have an incentive to inflate profits. Hedge funds also pay large placement fees to those who bring investors into the fund. These fees are paid by the investors.

34.     Finally, hedge funds are typically extremely illiquid investments. They are subject to long-term "lock up" periods, and only become liquid once a "lock-up" period expires. Even then, however, a hedge fund manager often has discretion to refuse an investor's redemption request.

35.     Hedge funds -- as Defendants knew -- were not appropriate for investors like the Neagles who told Defendants that they did not want to participate in extremely risky, illiquid investments.

**Private Equity Fund Characteristics**

36.     Private equity funds are even riskier than hedge funds. Indeed, they are the riskiest of the Alternative Investments.

37.     A private equity fund typically buys companies in order to manage them and build them up. The investor, however, owns an interest in the fund, but not any specific asset owned by the fund.

38.     The investor usually is a limited partner, giving money to the fund's general partner and relying on the general partner's expertise to manage and extract value from the fund.

39.     As with hedge funds, private equity funds subject investors to negative tax consequences described in paragraph 32 above, and investors often are contractually obligated to make frequent cash infusions through "capital calls."

40.     Further, private equity funds are even less liquid than hedge funds, and there is no secondary market for them. Instead, private-equity-fund investors usually are contractually bound to remain in the investment for years, sometimes as long as 30 years. At times, the investors can never "get out" of these funds.

41.     One of the worst attributes of private equity funds is that the fund manager is guaranteed its fee even if the fund does not do well. The fees are exorbitant compared to those paid to a typical money manager handling publicly traded investments like stocks, bonds and mutual funds.

42.     Private equity funds -- as Defendants knew -- were not appropriate for investors like the Neagles, who told Defendants that they did not want to participate in extremely risky, illiquid investments.

**Undisclosed Risks And Drawbacks Of The Neagles' Investments**

43.     Many of the Alternative Investments into which Defendants placed the Neagles had or have the severe risks and drawbacks described above, none of which Defendants ever disclosed to the Neagles.

44.     Further, despite the fact that the Alternative Investments were wholly unsuited to the Neagles -- and at odds with Leavitt's and LCM's duties to the Neagles -- Leavitt and LCM placed a substantial amount of the Neagles' portfolio in Alternative Investments.

45.     As Defendants knew, the Neagles never were supposed to have been invested in the Alternative Investments given the risks described above. Yet, at one point, an astonishing 80% of the Neagles' portfolio was invested in the Alternative Investments.

46.     In fact, Leavitt and LCM placed the Neagles in such investments during a time when the Neagles' lives were in complete turmoil. Indeed, Leavitt and LCM placed the Neagles in risky, illiquid, fee-laden Alternative Investments when they knew: (a) Dennis had to retire from baseball due to serious injuries and, thus, could not continue to earn a living using his baseball skills; (b) Jennifer gave birth to premature twins who required extensive medical care; and (c) the Neagles' marriage fell apart and Jennifer filed for divorce.

47.     Thus, precisely during the time that the Neagles had a heightened need for conservative, liquid, investments, Defendants were ensuring the exact opposite occurred.

**The Neagles' Illiquid And Highly Risky Investments**

48.     Contrary to the Neagles' need for conservative and liquid investments, the Alternative Investments are very illiquid, and the Neagles are locked into many of them for years, if not forever. Further, the Alternative Investments cannot be sold on the secondary market.

49.     For example, Northbrook Receivable Partners, LLC ("Northbrook") is an Alternative Investment managed by LCM that is currently operating at a loss. Defendants placed the Neagles in this investment, but the Neagles can never redeem that investment. Likewise, Defendants placed the Neagles in Cardinal Capital L.P. ("Cardinal") -- a fund that is now in liquidation -- which is not redeemable by the Neagles until 2029.

50.     Aquilo Partners LLC ("Aquilo") is another LCM-managed Alternative Investment in which Defendants placed the Neagles. It subjects the Neagles to a 12-year lockup period that, to date, has not even begun to run.

51.     Moreover, even if the Neagles could theoretically redeem their interests in a particular fund, LCM often has the discretion to keep the Neagles in that Alternative Investment if LCM determines that it is in the fund's best interests to do so. For example, although the lock-up period has expired for Maxwell Halsted Partners, LLC ("Maxwell"), an LCM-managed Alternative Investment, Leavitt and LCM refuse to allow the Neagles to redeem their investment, despite numerous requests to do so.

52.     The same is true with respect to the Waveland Fund, L.P. ("Waveland") -- an Alternative Investment to which the Neagles are bound until sometime between 2016 and 2019. In fact, the Neagles have requested Defendants, in writing, to redeem their interest in this fund, but their requests have been denied.

53.     Leavitt and LCM never disclosed the foregoing risks or investment characteristics to the Neagles.

**Capital Calls**

54.     Some of the Alternative Investments into which the Defendants placed the Neagles have subjected the Neagles to capital calls. Worse, some of those capital calls were not

even issued for investment purposes. For example, Cardinal issued at least one capital call just to collect management fees. It issued another solely to obtain cash to fund the liquidation of its operations. None of this inured to the Neagles' benefit.

55.     Leavitt and LCM never disclosed that the Alternative Investments would subject the Neagles to capital calls.

**Negative Tax Consequences**

56.     The Alternative Investments have subjected and continue to subject the Neagles to negative tax consequences. Among other things, because the Alternative Investments are "pass through" entities, the Neagles often pay "phantom income" taxes without receiving cash from the investments to pay some or all of such taxes.

57.     To be sure, and thanks to Defendants' improper conduct, the Neagles over the years have been subject to thousands of dollars of phantom income tax.

58.     Leavitt and LCM never disclosed these negative tax ramifications to the Neagles. Indeed, Defendants never explained to the Neagles any of the foregoing characteristics or risks associated with the Neagles' Alternative Investments. They also never told the Neagles to seek independent legal or financial advice with respect to the Alternative Investments.

59.     To the contrary, Defendants preyed upon the trust the Neagles reposed in them and the Neagles' complete financial naïvité, and counted on the fact that the Neagles would invest in whatever Defendants told them to invest in. Leavitt and/or LCM then used the Alternative Investments in the Neagles' portfolio to profit handsomely -- and secretly -- at the Neagles' expense.

**Defendants Lined Their Pockets With Exorbitant And Secret Fees**

60.     The Alternative Investments charge exorbitant management fees. Moreover, one or both Defendants are managers of many of the Alternative Investment funds, and are guaranteed these fees regardless of whether the fund is successful.

61.     For example, Leavitt and LCM received exorbitant management fees for all LCM-managed Alternative Investments that they caused the Neagles to invest in, including: (a) Aquilo; (b) Northbrook; (c) Maxwell; (d) Red River Partners LLC; (e) Triton Partners LLC; (f) Dakota Partners Limited Partnership; (g) Terra Partners LLC; and (h) Pontifex Partners, LLC.

62.     These "secret" fees were on top of the other fees the Neagles paid to Leavitt and LCM for managing and paying the Neagles' bills, and neither Leavitt nor LCM ever disclosed that they would be receiving such fees.

63.     On information and belief, Leavitt and/or LCM also received secret placement fees and subsequent additional fees (called "trail" fees) for most, if not all, of the non-LCM managed Alternative Investments in which they caused the Neagles to invest. Such fees substantially exceed typical investment broker or money manager fees. For instance, and on information and belief, Leavitt and/or LCM received a large placement fee on an Alternative Investment that they procured on Jennifer's behalf in Vista Operating, Inc. ("Vista").

64.     Leavitt and LCM did not disclose to the Neagles that they would be receiving placement or "trail" fees for any of the Alternative Investments that they recommended to the Neagles.

**Leavitt And LCM Conceal Their Scheme**

65.     During all times relevant hereto, the Neagles had no idea that Leavitt and LCM were entering the Neagles into the Alternative Investments -- and profiting therefrom.

66.    Leavitt and LCM concealed their wrongdoing, and never disclosed the true nature and risks of the Alternative Investments. Indeed, Leavitt and LCM never explained to the Neagles that their life savings was being invested in vehicles other than conservative, liquid investments such as stocks, bonds, mutual funds, and cash. The Neagles, however, never suspected the Defendants' wrongful conduct because of their faith and trust that Leavitt and LCM would take care of them and act in their best interests.

67.    Leavitt and LCM even took affirmative steps to ensure that the Neagles would not know the negative aspects of the Alternative Investments.

68.    Typically, before binding the Neagles to a particular Alternative Investment, Leavitt and LCM sent to the Neagles a subscription agreement with a cover letter stating that LCM recommended that one or both of the Neagles invest in the Alternative Investment.

69.    Rather than explain the nature or risks of the investment, however, and knowing that the Neagles had ceded to Defendants all responsibility for managing their finances and investments, Leavitt and LCM completed the subscription agreements on the Neagles' behalf, tabbed the signature pages thereof, and just instructed the Neagles to sign those agreements where indicated.

70.    Given the Neagles' complete trust and confidence in Defendants and the Neagles' utter lack of financial acumen, Defendants' ruse was successful, and the Neagles -- as they were instructed to do -- simply signed the subscription agreements that authorized Leavitt and/or LCM to execute a wire transfer to invest in an Alternative Investment.

71.    In sum, because the Neagles placed all of their trust and confidence in Leavitt and LCM, the Neagles executed the subscription agreements that had been pre-completed by

13

Defendants and remained unaware that those investments were risky, illiquid, and completely at odds with their investment needs.

72.     Given the extreme trust and confidence that the Neagles placed in Leavitt and LCM, the Neagles would never have suspected Defendants' wrongdoing unless a person visiting Dennis's home in the late 2000s happened to notice and question one of the pre-completed subscription agreements described above.

**The Neagles' Damages**

73.     Leavitt and LCM damaged the Neagles in numerous respects.  As a direct consequence of Defendants' wrongdoing, the Neagles:

    (a)    paid exorbitant management fees to Alternative Investment fund managers, including Leavitt and LCM;

    (b)    paid taxes on phantom income;

    (c)    incurred huge losses in failing Alternative Investments they never should have been invested in;

    (d)    cannot now access or use much of their financial portfolio because it is locked into the illiquid Alternative Investments; and

    (e)    continue to be subject to substantial capital calls -- often in the hundreds of thousands of dollars -- for investments that yield no long-term investment payoff.

74.     The Neagles relied upon Leavitt and LCM to provide complete and truthful advice as the Neagles' trusted, long-term, financial advisers.  The Neagles would never have entered into the Alternative Investments but for the complete trust and confidence they placed in Defendants and Defendants' recommendations.  The Neagles reasonably believed that in making investment recommendations to them, Leavitt and LCM were acting as loyal, candid, diligent, disinterested and prudent financial advisers.  Instead, Leavitt and LCM were acting out of their own self interest, with no regard for the Neagles' best interest.

14

**COUNT I**
**Breach of Fiduciary Duty**
**(Against All Defendants)**

75.     The Neagles incorporate by reference paragraphs 1 through 74 above as and for paragraph 75 of Count I of this Complaint.

76.     By virtue of the foregoing, including Defendants' work as the Neagles' financial advisers, Defendants' access to and control of the Neagles' assets, and the enormous trust and confidence that the Neagles' placed in Defendants, Defendants owed fiduciary duties of loyalty, good faith, and fair dealing to the Neagles.

77.     Defendants betrayed that trust, and breached those fiduciary duties by: (a) knowingly recommending inappropriate investments to the Neagles; (b) concealing and/or failing to disclose the true characteristics and risks of those investments; (c) secretly profiting from those investments at the Neagles' expense; and (d) refusing to redeem the Neagles' interests in those investments.

78.     As a direct and proximate result of Defendants' breach, the Neagles have suffered and will continue to suffer significant damages.

79.     Defendants acted or omitted to act as described above consciously, deliberately, maliciously, in bad faith, and with the intent to injure the Neagles and in conscious disregard of their rights. The Neagles, therefore, seek punitive damages according to proof.

WHEREFORE, the Neagles respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, granting the following relief:

A.     Awarding compensatory damages plus pre-judgment interest in an amount to be determined at trial, in excess of $50,000;

B.     Ordering Defendants to return to the Neagles any and all amounts paid by the Neagles for the Alternative Investments;

C.     Requiring Defendants to disgorge and return to the Neagles any compensation or other benefits they received during the period of their breach, plus pre-judgment interest thereon;

D.     Awarding the Neagles their costs of suit;

E.     Awarding punitive damages to the Neagles in an amount sufficient to punish Leavitt and LCM for their intentional and malicious wrongdoing, and to deter them and others from acting in a similar manner; and

F.     Granting the Neagles any other relief this Court deems just and equitable.

**COUNT II**
**Negligent Misrepresentation**
**(Against All Defendants)**

80.     The Neagles incorporate by reference the allegations contained in paragraphs 1 through 74 as and for paragraph 80 of this Count II.

81.     Defendants are in the business of supplying financial and investment advice for the purpose of guiding others in their business dealings with third-parties.

82.     Before giving the Neagles the investment advice alleged herein, Defendants represented to the Neagles that they would carefully and prudently investigate investment opportunities prior to making any recommendations to the Neagles in connection therewith, and that the investments they recommended to the Neagles would be appropriate for the Neagles, and in line with the Neagles' need for conservative, liquid investments.

83.     Defendants each had a duty to exercise due care, diligence, skill, and professional competence in connection with any and all investment advice Defendants provided to the Neagles and to communicate accurate information with respect to such advice.

84.     Defendants violated their duties of due care, diligence, skill, and professional competence by, among other things, recommending inappropriate investments to the Neagles, and convincing the Neagles to invest therein.

85.     The recommendations made by Defendants were material and false because the investments they recommended were not appropriate or in line with the Neagles' needs.

86.     Defendants knew and intended that the Neagles would rely upon and use Defendants' investment advice.

87.     The Neagles reasonably relied on Defendants' advice.

88.     The Neagles were damaged as a direct and proximate result of Defendants' negligent misrepresentations described herein.

WHEREFORE, the Neagles request that this Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

A.      Awarding compensatory damages plus pre-judgment interest in an amount to be determined at trial, in excess of $50,000;

B.      Awarding the Neagles their costs of suit; and

C.      Granting the Neagles such additional and other relief as the Court deems appropriate.

## COUNT III
### Unjust Enrichment
### (Against All Defendants)

89.     The Neagles incorporate by reference the allegations contained in paragraphs 1 through 74 as and for paragraph 89 of this Count III.

90.     Defendants received numerous benefits to the detriment of the Neagles as a result of their wrongdoing, including their wrongful placement of the Neagles in the Alternative Investments.

17

## COUNT IV
### Accounting
### (Against All Defendants)

95.     The Neagles incorporate by reference the allegations contained in paragraphs 1 through 74 as and for paragraph 95 of this Count IV.

96.     By reason of Leavitt's and LCM's breaches of their fiduciary duties to the Neagles, as alleged herein, the complexity of the Alternative Investments and Leavitt's and LCM's commissions, placement fees, and other compensation related thereto, and the need for discovery with respect to all of the foregoing, the Neagles are entitled to an equitable accounting for all of Leavitt's and LCM's transactions relating to the Alternative Investments and the Neagles' other assets.

97.     The Neagles lack an adequate remedy at law absent the accounting requested herein.

WHEREFORE, the Neagles respectfully request that this Court enter an order against Defendants, jointly and severally, granting the following relief:

A.      Ordering Defendants to account for all Alternative Investments made by the Neagles, as well as all commissions, placement fees, and any other form of compensation derived by Defendants therefrom;

B.      Rendering judgment in favor of the Neagles and against the Defendants for any balance ascertained to be due the Neagles as a result of such accounting;

C.      Awarding the Neagles their costs of suit; and

D.      Granting the Neagles any other relief this Court deems just and equitable.

91.    These benefits include:

    (a)    all fees and other compensation paid to Defendants by the Neagles; and

    (b)    all fees, trails, and other compensation, paid to Defendants by one or more of the Alternative Investment funds, or as a result of the Neagles' investments therein.

92.    The foregoing benefits that Defendants received substantially exceed the value of the service and other consideration that Defendants purportedly provided to the Neagles.

93.    Defendants would not have received any of those benefits but for the aforesaid misconduct.

94.    Inequity would result to the Neagles if Defendants were allowed to retain the foregoing benefits. To prevent this inequity, Defendants should be compelled to pay to the Neagles all of the benefits they received as a result of their wrongdoing.

WHEREFORE, the Neagles respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, granting the following relief:

A.    Requiring Defendants to disgorge and return to the Neagles any of the benefits either Defendant received arising directly or indirectly from their wrongdoing, plus pre-judgment interest thereon;

B.    Awarding the Neagles their costs of suit;

C.    Awarding punitive damages to the Neagles in an amount sufficient to punish Leavitt and LCM for their intentional and malicious wrongdoing, and to deter them and others from acting in a similar manner; and

D.    Granting the Neagles any other relief this Court deems just and equitable.

## COUNT IV
### Accounting
### (Against All Defendants)

95.    The Neagles incorporate by reference the allegations contained in paragraphs 1 through 74 as and for paragraph 95 of this Count IV.

96.    By reason of Leavitt's and LCM's breaches of their fiduciary duties to the Neagles, as alleged herein, the complexity of the Alternative Investments and Leavitt's and LCM's commissions, placement fees, and other compensation related thereto, and the need for discovery with respect to all of the foregoing, the Neagles are entitled to an equitable accounting for all of Leavitt's and LCM's transactions relating to the Alternative Investments and the Neagles' other assets.

97.    The Neagles lack an adequate remedy at law absent the accounting requested herein.

WHEREFORE, the Neagles respectfully request that this Court enter an order against Defendants, jointly and severally, granting the following relief:

A.    Ordering Defendants to account for all Alternative Investments made by the Neagles, as well as all commissions, placement fees, and any other form of compensation derived by Defendants therefrom;

B.    Rendering judgment in favor of the Neagles and against the Defendants for any balance ascertained to be due the Neagles as a result of such accounting;

C.    Awarding the Neagles their costs of suit; and

D.    Granting the Neagles any other relief this Court deems just and equitable.

## COUNT V
### Aiding and Abetting Breach of Fiduciary Duty
### (Against LCM)

98.    The Neagles incorporate by reference the allegations contained in paragraphs 1 through 74 as and for paragraph 98 of this Count V.

99.    In the event that LCM is found not to have had a fiduciary relationship with the Neagles, then the Neagles will not be able to recover against LCM for breach of fiduciary duty. This Count, therefore, is brought in the alternative to Count I and only if it is determined that LCM did not have a fiduciary relationship with the Neagles.

100.    LCM had actual or constructive knowledge of Leavitt's fiduciary duties to the Neagles. Further, it knew that Leavitt's actions constituted a breach of these fiduciary duties.

101.    LCM knowingly and substantially assisted Leavitt in the breaches of his fiduciary duties to the Neagles by, *inter alia*:

- helping Leavitt place the Neagles in wholly inappropriate investments;

- helping Leavitt to conceal the risks and characteristics of such investments from the Neagles; and

- helping Leavitt to secretly profit therefrom at the Neagles' expense, and itself profiting from Leavitt's wrongdoing.

102.    This conduct was outrageous, willful and wanton, and perpetrated with malice and a reckless indifference to the rights of the Neagles.

103.    The Neagles have suffered injuries as a direct and proximate result of the aiding and abetting of Leavitt's breaches of fiduciary duty to the Neagles.

WHEREFORE, the Neagles respectfully request that this Court enter judgment in their favor and against LCM, granting the following relief:

A.    Awarding the Neagles compensatory damages in an amount to be determined at trial, but in excess of $50,000;

20

B.  Ordering LCM to return to the Neagles any and all amounts paid by the Neagles to LCM for the Alternative Investments;

C.  Requiring LCM to disgorge and return to the Neagles any compensation or other benefits it received during the period of its misconduct, plus pre-judgment interest thereon;

D.  Awarding the Neagles their costs of suit;

E.  Awarding punitive damages to the Neagles in an amount sufficient to punish LCM for its intentional and malicious wrongdoing, and to deter it and others from acting in a similar manner; and

F.  Granting the Neagles any other relief this Court deems just and equitable.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES TRIABLE BY A JURY**

JENNIFER & DENNIS NEAGLE

By: _____

One of Their Attorneys

Eric N. Macey
Christopher S. Moore
Alison T. Schwartz
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900
Firm No. 91731
#476308

21

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

FD-1

2012 JAN -9 PM 4:23

JENNIFER & DENNIS NEAGLE, )
)
    Plaintiffs, )
)
v. )
)
WILLIAM S. LEAVITT and LEAVITT )
CAPITAL MANAGEMENT, INC., )
)
    Defendants. )

CLERK
DOROTHY BROWN

Case No. 12CH00741

### RULE 222(b) AFFIDAVIT

    Christopher S. Moore, an attorney representing Plaintiffs in the above-captioned matter, pursuant to Illinois Supreme Court Rule 222(b), hereby certifies that the amount of damages sought by Plaintiffs exceeds $50,000.00.

    FURTHER AFFIANT SAYETH NAUGHT

                                       _____
                                         Christopher S. Moore

476817

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

JENNIFER & DENNIS NEAGLE, )
)
Plaintiffs, )
)
v. ) Case No.
) 12CH00741
WILLIAM S. LEAVITT and LEAVITT )
FINANCIAL CONSULTANTS, INC. d/b/a )
LEAVITT CAPITAL MANAGEMENT, INC., )
)
Defendants. )

## JURY DEMAND

Plaintiffs Jennifer Neagle and Dennis Neagle demand trial by jury on all issues triable to a jury

in their Complaint for Accounting and Other Relief.

Respectfully submitted,

JENNIFER & DENNIS NEAGLE

By: _____

One of Their Attorneys

Eric N. Macey
Christopher S. Moore
Alison T. Schwartz
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900
Firm No. 91731
#478221